## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FRIENDS OF ANIMALS, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**KEN SALAZAR, Secretary of the Interior,**<br><br>**Defendant.** | **Civil Action 04-01660 (HHK)** |
| **REBECCA ANN CARY, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ROWAN GOULD, Acting Director, Fish and Wildlife Service, et al.,**<br><br>**Defendants.** | **Civil Action 06-02120 (HHK)** |

## MEMORANDUM OPINION

In these consolidated cases, two sets of plaintiffs, Friends of Animals ("FOA") plaintiffs and Rebecca Ann Cary ("Cary") plaintiffs, bring an action against the Department of Interior, the Fish and Wildlife Service of the Department of Interior, and officials of these agencies in their official capacities (collectively, the "FWS").  The Safari Club International and Exotic Wildlife Association (collectively, the "Safari Club") also intervened as defendants.  Plaintiffs allege that the FWS unlawfully promulgated a rule under the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.* (the "ESA," or the "Act") exempting three endangered antelope species, the scimitar-horned oryx, the addax, and the dama gazelle (collectively, the "antelope" or the "antelope

species"), when bred in captivity in the United States, from the import, take and other prohibitions contained in the Act.  Plaintiffs assert violations under several sections of the ESA and under the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA").  Before the court are the parties' cross motions for summary judgment [## 61, 62, 66, 67 in Civil Action 04-1660 and ## 20, 21, 24, 25 in Civil Action 06-2120].  Upon consideration of the motions, the oppositions thereto, and the record of these cases, the court concludes that plaintiffs' motions should be granted in part and denied in part and defendants' motions should be granted in part and denied in part.

## I. BACKGROUND

A.      **Statutory Background**

The purpose of the ESA is to "provide a program for the conservation of [] endangered and threatened species."  16 U.S.C. § 1531(b).  The Act established a national policy "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]."  *Id.* § 1531(c).  Section 4 of the ESA directs the FWS to list species that it determines are endangered or threatened.  *Id.* § 1533(c).  Once a species is listed as endangered, it receives the full protections of the Act.

Section 9 of the ESA contains several prohibitions with respect to species listed as endangered, including prohibitions on importing, exporting, and taking such species.  *Id.* § 1538(a).  "Taking" an endangered species includes harming, harassing, pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting such species.  *Id.* § 1532(19).  Section 10 of the ESA provides three exceptions to these prohibitions.  *Id.* § 1539.  First, and

most relevant to this case, paragraph 10(a)(1)(A) authorizes the FWS to "permit . . . any act

otherwise prohibited by [section 9] for scientific purposes or to enhance the propagation or

survival of the affected species, including, but not limited to, acts necessary for the establishment

and maintenance of experimental populations . . . ." *Id*. §1539(a)(1)(A). In addition, paragraph

10(a)(1)(B) authorizes an exception for takes which are incidental to carrying out an otherwise

lawful activity, *id.*§ 1539(a)(1)(B), and section 10(b) authorizes hardship exemptions in specific

cases where the Act will cause undue economic hardship, *id*. § 1539(b). With respect to

applications for permits or exemptions made under section 10, the Secretary must comply with

two requirements, contained in subsections 10(c) and (d), which state:

> (c) Notice and Review. The Secretary shall publish notice in the Federal Register
> of each application for an exemption or permit which is made under this section.
> Each notice shall invite the submission from interested parties, within thirty days
> after the date of the notice, of written data, views, or arguments with respect to the
> application . . . . Information received by the Secretary as part of any application
> shall be available to the public as a matter of public record at every stage of the
> proceeding.

> (d) Permit and exemption policy. The Secretary may grant exceptions . . . only if
> he finds and publishes his finding in the Federal Register that (1) such exceptions
> were applied for in good faith, (2) if granted and exercised will not operate to the
> disadvantage of such endangered species, and (3) will be consistent with the
> purposes and policy [of the Act].

*Id*. § 1539(c), (d).

**B.    Factual Background**

The antelope species at issue in these cases are native to the deserts of northern Africa.

Today, the scimitar-horned oryx is extinct in the wild, and there are very few addax or dama

gazelle in the wild. In 1991, the FWS proposed listing the antelope species as endangered. 56

Fed. Reg. 56491-95 (November 5, 1991). It was not until 2005, following a lawsuit, however,

that the FWS listed the antelope species as endangered.  *See* 70 Fed. Reg. 52319 (Sept. 2, 2005).

In that listing, the FWS found that the decline of the antelope species in their native range was

due to habitat loss through desertification, human settlement and competition with livestock, and

regional military activity and uncontrolled killing.  *Id.*

Private ranches in the United States breed the antelope species in captivity.  Some of

these ranches allow sport hunters to kill antelopes for a fee.  At the same time that the FWS listed

the antelope as endangered, it also issued a rule ("Rule") under paragraph 10(a)(1)(A) of the Act

excepting United States captive-bred members of the antelope species from the take and other

prohibitions of section 9 of the ESA.  70 Fed. Reg. 52310 (Sept. 2, 2005).  The FWS found,

"[b]ased on information available to the Service, captive breeding in the United States has

contributed significantly to the conservation of these species."  *Id.* at 52315.  The Rule states

that:

> any person subject to the jurisdiction of the United States may take; export or re-
> import; deliver, receive, carry, transport or ship in interstate or foreign commerce,
> in the course of commercial activity; or sell or offer for sale in interstate or foreign
> commerce live wildlife, including embryos and gametes, and sport hunted
> trophies of [the antelope species under certain circumstances].

*Id.* at 52318.  These circumstances include:  (1) the purpose of the activity must be associated

with the management or transfer of wildlife in a manner that "contributes to increasing or

sustaining captive numbers or to potential reintroduction to range countries," (2) captive-

breeding operations must be managed in a manner that maintains genetic diversity, and (3) each

person claiming the benefit of the exception must maintain accurate written records of activities,

including births, deaths, and transfers and make those records accessible to the FWS for inspection. *Id*. at 52318-19. It is this Rule that plaintiffs challenge.[1]

## II.  ANALYSIS

This case comes before the court on the parties' cross motions for summary judgment.[2] The cross motions raise two principle issues:  first, whether plaintiffs have standing to bring this lawsuit, and second, whether the Rule issued by the FWS is lawful.

**A.      Plaintiffs Have Standing to Bring Their Claim Under Subsection 10(c) of the ESA.**

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'"  *Davis v. FEC*, — U.S.—, 128 S.Ct. 2759, 2768 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  As the party invoking federal jurisdiction, plaintiffs bear the burden of establishing the three elements of standing. *Lujan*, 504 U.S. at 560-61.  First, plaintiffs must establish that they have suffered an "injury in fact." *Id*. at 560.  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id*. (internal quotations omitted).  Second, plaintiffs must establish that there is a causal connection between the injury and the challenged conduct, meaning that the injury alleged is "fairly traceable to the challenged action of the defendant."  *Id*. (internal citations and quotations

_____

[1] Cary plaintiffs originally filed their action challenging the Rule in the District Court for the Northern District of California. *See Cary v. Hall*, 2006 WL 6198319 (November 30, 2006). That court transferred the case to this court to consolidate it with the FOA plaintiffs' case. *Id*.

[2] Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review. *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (*citing Richards v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).

omitted).  Third, it must be "likely," as opposed to "merely speculative," that the injury will be "redressed by a favorable decision."  *Id*. at 561 (internal citations and quotations omitted).

Defendants challenge plaintiffs' standing to bring this suit.  Plaintiffs assert that they have standing under several theories.  FOA plaintiffs assert representational standing on behalf of Priscilla Feral, president of FOA, based on her interest in both the antelope species in the wild and the antelope species in captivity, to bring claims under sections 4, 7, and 10 of the ESA and under NEPA.  FOA and Cary plaintiffs assert organizational standing to bring claims under section 10 of the ESA based on an informational injury.  Finally, FOA plaintiffs assert organizational standing under sections 4, 7, and 10 of the ESA and NEPA because the Rule drains their organizations' resources.  The court will address each asserted basis for standing in turn.

       *1.*     *Representational Standing Based on Feral's Interest in Wild Antelope*

FOA plaintiffs argue that Feral has standing to challenge the Rule because the Rule injures her aesthetic interest in viewing the antelope species in the wild.  They state that Feral has visited Senegal to observe wild antelopes, has devoted herself to the preservation of wild antelopes, and intends to return to Africa to see them again.  The Rule is fairly traceable to this injury, according to FOA plaintiffs, because it increases the incentive for poachers to kill wild members of the antelope species by creating a legal market for antelope parts and trophies.  FOA plaintiffs argue that Congress itself established this chain of causation because the ESA was enacted specifically to prevent the loss of listed species, and because the legislative history indicates a Congressional intention to eliminate financial incentives to take endangered species.

The FWS responds that Feral has not established any of the three required elements for standing, arguing that she has no concrete plans to view the antelope species in the wild and therefore no cognizable injury, and that FOA has provided no evidence that eliminating the Rule (which regards captive-bred antelope only) will have an effect on the poaching of wild antelope, and therefore has not shown causation. Further, the FWS argues that the ESA does not include specific provisions regarding the relationship between trade in legally taken United States captive-bred antelopes and poaching of wild antelopes and therefore Congress has not established a chain of causation. The FWS is correct.

In *Cary*, the District Court for the Northern District of California evaluated a similar argument made by the Cary plaintiffs in that court before the case was transferred to this court. *Cary*, 2006 WL 6198320, at *6. The *Cary* court determined that while plaintiffs may have suffered an aesthetic injury, the injury was not caused by the Rule because the Rule does not authorize the take of *wild* antelopes or the importation of *wild* antelope parts or trophies. *Id*. at *6. Plaintiffs' theory in *Cary* – that the Rule sent a signal that hunting antelope was acceptable and that this signal would cause hunters to kill wild antelope – was purely speculative, according to the *Cary* court. *Id*. This court finds the analysis and conclusions of the *Cary* court highly persuasive. FOA attempts to distinguish its challenge in two ways. First, it argues that Congress itself established causation in this case, an argument not raised by the Cary plaintiffs, pointing to two phrases in the legislative history that state that the Act would make taking endangered species less profitable. Second, FOA plaintiffs argue that the method of causation they allege is not that the Rule sends a signal that hunting these antelope is acceptable, as the *Cary* plaintiffs contended, but that the creation of a legal market for captive antelope parts and trophies will

encourage the poaching of wild antelopes.  The court concludes that neither of these arguments is persuasive.

The legislative history that FOA points to comes from the House of Representatives committee report, which states that, "[t]he threat to animals may arise from a variety of sources; principally pollution, destruction of habitat and the pressures of trade."  H.R. Rep. No 93-412, at 2 (July 27, 1973).  The report then goes on to state that prior to consideration of the ESA, most attention had focused on trade and "attempt[ed] to enforce legislation designed to reduce or eliminate the financial incentives to trading in endangered species of fish and wildlife."  *Id*.  FOA also points to a floor statement by Representative Sullivan during deliberations on the House of Representatives bill, in which he states that a hazard to endangered species arises from those who would capture or kill them for pleasure or profit, and that while "[t]here is no way that the Congress can make it less pleasurable for a person to take an animal, [it] can certainly make it less profitable for them to do so."  House Consideration and Passage of H.R. 37, with Amendments, at 192 (1973).

None of these statements, however, persuades the court that Congress created a chain of causation between the legal trade in United States captive-bred antelope and the poaching of wild antelope abroad.  Plaintiffs point to *Animal Welfare Inst. v. Kreps*, 561 F.2d 1002 (D.C. Cir. 1977) to support their argument that Congress created a chain of causation in this case.  In *Animal Welfare*, the D.C. Circuit concluded that Congress, in enacting the Marine Mammal Protection Act ("MMPA"), established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices.  *Id*. at 1010.  The court stated that Congress made a decision that "denial of import privileges is an effective

8

method of protecting marine mammals in other parts of the world." *Id.*  This case is different because there is no statutory language or legislative history to support the idea that Congress decided, or even considered, whether permitting trade in species *bred in captivity in the United States* would create financial incentives for increased poaching abroad.  While the language plaintiffs point to demonstrates that Congress generally believed that reducing trade would reduce financial incentives to take species, Congress also recognized that in some cases trade might enhance the propagation or survival of species as evidenced by the statutory language contained in paragraph 10(a)(1)(A).

Nor do plaintiffs present any evidence that the Rule actually does increase the financial incentives for taking the antelope species in the wild.   FOA plaintiffs point to three things to support their argument that the creation of a legal market in antelope parts and trophies from antelopes bred in captivity in the United States will lead to increased poaching of wild antelope – the FWS's rule listing the antelope species as endangered, and the declarations of Tarig Osman and Limia Ibrahim.  What this evidence shows is that illegal poaching of wild antelopes occurs. It does not show that such poaching is fairly traceable to the existence of a legal market.  *See* 70 Fed. Reg. at 52,321; Attach. 2 & 3 to FOA Pls.' Mot. Summ. J.  By contrast, in *Animal Welfare*, there was "substantial factual evidence in the record . . . that South African sealing practices will respond to stricter enforcement of the MMPA."  561 F.2d at 1010.  The court finds that FOA plaintiffs do not have standing on this basis because even if Feral has suffered an injury, she has not demonstrated that it is fairly traceable to the Rule.

2.    *Representational Standing Based on Feral's Interest Captive Antelope*

FOA plaintiffs also contend that Feral has standing based on her interest in the antelope

species in captivity.  FOA plaintiffs argue that Feral "suffered aesthetic injury as a result of

viewing animals in captivity on hunting ranches" as part of her job as President of FOA.  FOA

Pls.' Mot Summ. J. at 38.  Specifically, Feral declares that she visited three hunting ranches in

1991 and 2006 to observe their practices and viewed scimitar-horned oryx in captivity, as well as

numerous pictures of hunters posing with dead scimitar-horned oryx, dama gazelle, and addax.

The FWS responds that these visits cannot support Feral's claim of injury because during her

visit in 1991 she does not declare that she viewed any of the antelope species subject to the Rule,

and her 2006 visit was in May, several months after FOA filed its amended complaint.  Further,

the FWS argues, Feral has not declared any intention to return to any hunting ranches.  The FWS

is correct.[3]  Feral cannot establish standing based on an aesthetic injury suffered from viewing

animals that may or may not have been scimitar-horned oryx, dama gazelle, or addax, and her

May 2006 visit does not qualify because standing "depends on the facts *as they exist when the*

---

[3]  The court notes that the FWS's alternative argument that Feral does not meet the
causation requirement because the conditions she complains of existed before the Rule and
continue to exist after the Rule unchanged and so were not created by the Rule is meritless.  The
FWS repeats this argument several times with respect to plaintiffs' asserted bases for standing.
Given the listing of the antelope species as endangered, it is the Rule that allows the activity that
plaintiffs argue is unlawful.  *See Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 441
(D.C. Cir. 1998) ("The proper comparison for determining causation is not between what the
agency did and the status quo before the agency acted. Rather, the proper comparison is between
what the agency did and what the plaintiffs allege the agency should have done under the
statute.").

*complaint is filed." See Lujan*, 504 U.S. at 571 n.4 (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 230 (1989)).[4]

### 3. Organizational Standing Based on an Informational Injury

Both FOA and Cary plaintiffs assert organizational standing to challenge alleged violations of subsections 10(c) and 10(d) of the ESA based on an informational injury. They argue that these subsections grant a statutory right to information regarding each permit. The Rule, according to plaintiffs, eliminates these permit requirements and so deprives them of their statutory right to that information. The FWS responds that plaintiffs need to do more than assert a statutory right to information, but must also demonstrate a concrete harm to a particular organizational interest. Instead, according to the FWS, plaintiffs assert only a generally available grievance about the government. The FWS argues that the only particularized interest plaintiffs allege is a drain on their resources to educate the public and obtain information from other sources, and that plaintiffs lack the requisite specificity in their declarations to demonstrate this injury. The Safari Club further argues that a wealth of information was provided to plaintiffs through the promulgation of the Rule and that the information plaintiffs seek is available on the Internet. Plaintiffs are correct with respect to standing under subsection 10(c) and incorrect with respect to standing under subsection 10(d).

---

[4] In reply, FOA plaintiffs argue that Feral is also injured because her job includes researching and studying current antelope recovery efforts and thus conducting Internet searches, which inevitably lead to graphic pictures of endangered antelope trophies and hunting advertisements. The immediate problem with this argument is that Feral's declaration does not support it. While FOA plaintiffs cite paragraph 16 of her declaration to support its argument, this paragraph does not contain any statements about her Internet searches. *See* Attach. 1 to FOA Pls.' Mot. Summ. J. at ¶ 17.

A plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *see Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) ("a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimant's reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them'" (quoting *Akins*, 524 U.S. at 21)).  The harm to a plaintiff may be widely shared, but must be concrete and specific.  *Akins*, 524 U.S. at 25.  "Allegations of injury to an organization's ability to disseminate information may be deemed sufficiently particular for standing purposes where that information is essential to the injured organization's activities."  *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 122 (D.C. Cir. 1990).

The *Cary* court ruled, at the motion to dismiss stage, that *Cary* plaintiffs had standing to challenge the Rule under subsection 10(c) of the ESA based on an informational injury.  *Cary*, 2006 WL 6198320, at *11.  That court found that subsection 10(c) of the Act creates a right to information sufficient to support standing, and that "[b]y alleging that the challenged regulation effectively denies [plaintiff] information required to be made publicly available under § 10(c) so that [plaintiff] can meaningfully participate in the § 10 permit process, [plaintiff] has alleged a concrete injury that comes within the zone of interests protected by § 10(c)."  *Id*. at *10.  The *Cary* court held that the injury was actual or imminent because plaintiffs regularly comment on section 10 permits, and "[c]ausation and redressability are clear."  *Id*.  This court concludes that the *Cary* court's analysis is highly persuasive and adopts that court's reasoning in full.

12

The FWS argues that the circumstances here are different than those in *Cary* because the FWS has filed a motion for summary judgment, not a motion to dismiss. The FWS is correct that at the summary judgment stage the burden is greater on plaintiffs to demonstrate that the injury they allege is concrete, specific, actual and imminent. The court finds that plaintiffs have done so with respect to their alleged injury under subsection 10(c). Plaintiffs suffer an informational injury that is specific and concrete because they regularly use information from the section 10 permitting process to participate in the subsection 10(c) process and to inform their members. *See Cary* Pls.' Mot. Summ. J. Ex. G ¶ 17 (declaration of Andrew Page of the Humane Society of the United States, stating "[W]e rely heavily on the information required by the section 10 process. Not only do we use this information . . . to comment on the permit applications, but also we use the information to prepare articles and reports, inform our members, and document examples for use in lobbying and other advocacy work"); Ex. L ¶ 10 (declaration of Nina Fascione of Defenders of Wildlife stating, "We also rely on the information that we obtain and the public process provided under section 10 of the ESA to send out action alerts to our members, update our website, write stories for our newsletter, compile detailed reports, and work with the news media"). The injury is actual and imminent because plaintiffs regularly participate in and comment during the subsection 10(c) process. *See id.* Ex. G ¶ 14 (declaration of Page stating, "[s]taff working on our hunting abuse campaign regularly monitor the Federal Register for notices of proposals to kill endangered species at captive hunting facilities," and "submit comments to the the FWS"); Ex. L ¶ 10 (declaration of Fascione stating, "Defenders routinely requests section 10 application materials, comments on permit appications, and reviews and sometimes brings legal challenges to FWS's decisions to issue permits . . . .").

The *Cary* court did not reach the question of whether plaintiffs also sustained an informational injury that conferred standing to challenge the Rule under subsection 10(d) of the ESA.[5]  Plaintiffs argue that they do because the "findings" required by subsection 10(d) are integral to the section 10 process.  Subsection 10(d) states that exceptions may only be granted if the FWS "finds and publishes [its] finding in the Federal Register that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy" of the Act.  16 U.S.C. § 1539(d).  Such findings, plaintiffs contend, provide interested persons with important information that they would not otherwise be able to obtain.  Without the opportunity to learn that the FWS issued a permit and the bases for the permit, according to plaintiffs, plaintiffs cannot ask the agency to reconsider its position or challenge a permit in court.  The FWS rejoins that plaintiffs inappropriately make a public policy argument, and point out that constitutional standing is not subject to public policy considerations.  The FWS is correct.

The question before the court is whether subsection 10(d), like subsection 10(c) creates a statutory right to information deprivation of which causes plaintiffs a specific, concrete, actual and imminent injury.  The court concludes that it does not.  Subsection 10(c) of the ESA creates an explicit statutory right to information.  *See* 16 U.S.C. § 1539(c) ("Information received by the Secretary as a part of any application shall be available to the public as a matter of public record

---

[5]  The *Cary* court "observe[d], however, that it is doubtful whether the findings required to be published under § 10(d) are essential to make public participation in the § 10 permit process meaningful." *Cary*, 2006 WL 6198320, at * 11.  That court stated that, "[i]n the absence of a specific provision authorizing suit for violations of § 10(d) or a zone of interests narrower than a general interest in agency compliance with statutory requirements, it is unclear whether the informational interests ostensibly protected by § 10(d) are sufficient to support constitutional, prudential and statutory standing." *Id.*

at every stage of the proceeding."). Subsection 10(d), by contrast, requires the Secretary to make certain findings. *See id.* § 1539(d) ("The Secretary may grant exceptions . . . only if he finds and publishes his finding in the Federal Register that . . . ."). While, to be sure, subsection 10(d) requires the Secretary to publish her findings, this is different from the subsection 10(c) requirement that information be made available to the public. Importantly, the information provided in subsection 10(c) is necessary for plaintiffs to meaningfully participate in the section 10 process, and therefore deprivation of that information causes a specific, concrete, actual and imminent injury. By contrast, the findings in subsection 10(d) are published at the conclusion of the section 10 process following the mandated public process. While plaintiffs argue that such findings are necessary for them to ask the FWS to reconsider its decision or to challenge the FWS's decision in court, this is not an injury to their ability to participate in the section 10 process, but instead reveals a more general interest in the law being followed. *See Judicial Watch, Inc. v. FEC*, 180 F.3d 277, 278 (D.C. Cir. 1999) (holding that an injury amounting to "no more than a generalized interest in the enforcement of the law" does not support standing) (internal quotation omitted). The court concludes that plaintiffs have suffered an informational injury which confers standing to challenge the Rule under subsection 10(c) of the Act.

4.     *Organizational Standing on Other Bases*

Cary and FOA plaintiffs also contend that they suffer organizational injuries. A plaintiff suffers an organizational injury if the alleged violation "perceptibly impair[s]" its ability to carry out its activities. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (holding that organizational standing is proper where the challenged conduct has directly harmed an

organization's ability to provide services).  Plaintiffs do not have standing, however,if all the alleged violation does is set back their organization's abstract social interests or frustrate its objectives.  *See Nat'l Taxpayers Union*, 68 F.3d at 1433 (holding that frustration of an organizations' objectives "is the type of abstract concern that does not impart standing.").

For very similar reasons to those that support plaintiff's informational standing under subsection 10(c), the court concludes that plaintiffs have adequately demonstrated an organizational injury under that subsection.  Plaintiffs suffer an organizational injury because the Rule directly conflicts with their activities and the services they provide in learning about and informing the their members of the status of captive antelopes and participating in the section 10(c) process.  *See id.* Ex. L ¶ 17 (declaration of Nina Fascione stating, "[a]s a result of the FWS's regulation, Defenders has . . . spent resources conducting on-line research,  . . . and otherwise endeavoring to learn about these species in the U.S."); Ex. G ¶ 19 (declaration of Andrew Page of the Humane Society of the United States stating, "as a result of the new regulation, we have had to dedicate additional resources . . . to obtain information on the sport hunting of these three Antelope species . . . includ[ing] submitting requests for information under the Freedom of Information Act, conducting research on-line . . . .").

FOA plaintiffs assert more broadly that they have organizational standing to challenge the Rule generally (under ESA sections 4, 7 and 10 and NEPA) because the Rule drains FOA's resources.  FOA plaintiffs argue that the Rule is at loggerheads with FOA's mission, noting that it makes their efforts to restore the antelope species in their native ranges more difficult, and requires them to divert time and resources away from their mission in order to counteract the Rule.  The FWS responds that FOA plaintiffs must establish a concrete and demonstrable injury

to FOA's activities, and not merely a drain on its resources, something the FWS contends FOA plaintiffs have not done. The FWS argues that because the Rule will enhance the survival of the antelope species, it is not in conflict with FOA's mission.

In reply, FOA plaintiffs contend that the Rule directly conflicts with their activities in two ways. First, they state that if antelopes from hunting ranches are reintroduced in the wild, this will undermine FOA's efforts to restore the antelope species because the Rule does not require any safeguards to ensure the quality of the antelope's genetic makeup. Second, FOA argues that the Rule will increase incentives to poach, repeating the arguments it made in support of Feral's standing. FOA plaintiffs also argue that by allowing the killing of antelope, the Rule conflicts with their mission to preserve the antelope species. The FWS rejoins that FOA's contentions are purely speculative because the Rule does not authorize or direct reintroduction and because FOA plaintiffs do not present evidence to support their theory that the Rule will increase poaching in the wild. The FWS is correct.

Beyond the deprivation of information that hinders plaintiff organizations in the informational service they provide to their members and their ability to participate in the subsection 10(c) process, plaintiffs have not demonstrated that the Rule hinders their *activities* in any other concrete way. FOA plaintiffs' argument that the introduction of an antelope from a hunting ranch could affect the genetic makeup of the herds FOA supports in the antelope species' native range is entirely speculative. Likewise, as explained above, FOA plaintiffs have not presented any evidence that the Rule increases incentives for poaching in the antelope species' native range. Finally, FOA plaintiffs' assertion that the Rule conflicts with their mission to preserve antelopes is exactly the type of abstract social interest or frustration of purpose that does

17

not support standing. *See Havens Realty Corp.*, 455 U.S. at 379.[6]  Because the court concludes

that plaintiffs have standing only to pursue their claim that the FWS violated subsection 10(c) of

the Act when it promulgated the Rule, the court grants summary judgment to the FWS on all of

the plaintiffs' other claims.  The court now turns to plaintiffs' allegations under subsection 10(c).

**B.      The Rule Violates Subsection 10(c) of the ESA.**

Plaintiffs argue that the FWS violated subsection 10(c) of the ESA when it issued a

blanket exception for *all* persons who breed the antelope species in captivity in the United States

without any requirement for an application and case-by-case assessment of that application.

They argue that the plain language of subsection 10(c) demands that permits be issued on a case-

by-case basis, pointing to provision that "[t]he Secretary shall publish notice in the Federal

Register of *each* application for an exemption or permit which is made under this section." *See*

16 U.S.C. §1539(c) (emphasis added).  The FWS rejoins that the plain language dictates just the

opposite and point to the language of paragraph 10(a)(1), which states that "[t]he Secretary may

permit . . . *any act* otherwise prohibited by section 9 . . . to enhance the propagation or survival of

the affected species." *See id.* § 1539(a)(1) (emphasis added).  The court concludes that plaintiffs

are correct and that the text, context, purpose and legislative history of the statute make clear that

Congress intended permits for the enhancement of propagation or survival of an endangered

---

[6]  FOA plaintiffs vaguely suggest that they have suffered a procedural injury under sections 4 and 7 of the ESA and under NEPA.  *See* Pls.' Mot. Summ. J. at 41.  While the causation and redressibility requirements are relaxed for procedural injuries, *see Lujan*, 504 U.S. at 572, they are not eviscerated.  A plaintiff alleging a procedural injury must show "that the government act performed without the procedure in question will cause a distinct risk to a particularized interest." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1167 (D.C. Cir. 2005) (internal citation omitted).  Plaintiffs here have failed to meet this relaxed requirement.

species to be issued on a case-by-case basis following an application and public consideration of that application.

Under the Administrative Procedures Act, a court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory . . . authority . . . or short of statutory right." 5 U.S.C. § 706(2). The Supreme Court, in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), set forth the applicable methodology for reviewing whether an agency's interpretation of a statute it administers is in accordance with the law. Under *Chevron*, the court first must determine whether Congress has "directly spoken to the precise question at issue." *Id*. at 842 ("If the intent of Congress is clear, that is the end of the matter . . . ."). If Congress has not directly spoken, then the court must defer to a "permissible" construction of the statute by the agency. *Id*. at 843.

To determine whether Congress has directly spoken to the issue under the first step of the *Chevron* analysis, the court begins with the statutory language. *Chevron*, 467 U.S. at 842. If the statute's text is plain and unambiguous, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (internal citations omitted). The plainness or ambiguity of statutory language "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). If analysis of the statutory language and its context does not yield a plain meaning, the court may look to the statute's overall purpose and its legislative history to discern Congress's intent. *See id*. at 341 (interpreting an ambiguous statutory term in light of the statute's overall purpose); *Chevron*, 467

U.S. at 845-54 (discussing at length the legislative history of the relevant statute after finding the statute's text an inadequate guide as to the meaning of the provision interpreted by the challenged regulations).

After examining the text, context, purpose and legislative history of section 10, the court concludes that subsection 10(c) requires case-by-case consideration before the FWS may permit otherwise prohibited acts to enhance the propagation or survival of endangered species.

### 1. Text and Context

Plaintiffs argue that the plain language of subsection 10(c) shows that Congress intended the FWS to engage in an individualized permitting process.  They point to the language of subsection 10(c), which states that the FWS "*shall* publish notice in the Federal Register of *each application* for an exemption or permit," and that such notice "shall invite the submission from interested parties . . . of written data, views, or arguments *with respect to the application*."  *See* 16 U.S.C. § 1539(c) (emphasis added).  Under paragraph 10(a)(1)(A), FOA plaintiffs argue, the FWS may permit specific acts, and under section subsection 10(c), it must publish notice of *each* application for *an* exemption or permit.  They contend that the use of singular words such as "each" and "an" denote a requirement for individualized permits.  Further, plaintiffs note that the title of subsection 10(a) is "Permits," suggesting that Congress contemplated that exceptions under subsection 10(a) would be in the form of permits and not broad regulations.  *See id*. § 1539(a).  Plaintiffs point out that the FWS itself has interpreted paragraph 10(a)(1)(A) to require the submission of an application for a permit authorizing prohibited activities to enhance the propagation or survival of endangered species in its regulations implementing section 10.

The FWS responds that it complied with the plain language of subsection 10(c) when it published a notice in the Federal Register of its proposal to exempt certain otherwise prohibited activities with respect to the antelope species, provided a 60-day comment period on the proposal, and made all information received available to the public.  It argues that plaintiffs cite to nothing in the plain language of subsection 10(c) that requires the FWS to issue *individual* permits or prohibits it from issuing a single exemption provided it provides notice, invites submissions of comments, and makes publicly available all of the information received.  The FWS argues that where Congress intends to require individual applications, it says so, pointing to the provisions regarding incidental take permits and hardship exemptions, which call specifically for applications.  Paragraph 10(a)(1), by contrast, does not contain such language, stating instead that the FWS may permit "any act otherwise prohibited."  The Safari Club makes an additional plain language argument.  It argues that by using the phrase "may permit" as opposed to "may issue permits" in paragraph 10(a)(1) Congress did not evince an intent to require a permit-by-permit process.  With respect to plaintiffs' arguments about the FWS's own interpretation of paragraph 10(a)(1)(A) in its regulations, the FWS rejoins that just because it implements section 10 in a particular way with respect to other species does not mean that it must use this process to implement section 10 with respect to all species.  Plaintiffs have the better argument.

Subsection 10(c) reads, in part, "[t]he Secretary shall publish notice in the Federal Register of *each application* for an exemption or permit which is made under *this section*. . . . Information received by the Secretary as part of *any application* shall be available to the public . . . ."  16 U.S.C. § 1539(d) (emphasis added).  Through this language, Congress clearly contemplated that the FWS would exercise its authority to grant exceptions under "this section"

(i.e., section 10) by responding to individual applications.  The court's plain reading of subsection 10(c) is reinforced when that subsection is placed in context.  The structure of section 10 is strikingly symmetric.  Subsection 10(a) authorizes "Permits."  16 U.S.C. § 1539(a).  Subsection 10(b) authorizes "Hardship Exemptions."  *Id* § 1539(b).  Subsections 10(c) and 10(d) then put limits on the Secretary's authority to grant such "Permits" and "Exemptions."  *See id.* § 1539(c) ("The Secretary shall publish notice in the Federal Register of each application for an *exemption* or *permit* which is made under this section.") (emphasis added); § 1539(d) ("*Permit and Exemption* Policy.–The Secretary may grant exceptions under subsections (a)(1)(A) and (b) of this section only if . . . .") (emphasis added).  The context leads the court to conclude that Congress intended two routes for authorizing exceptions to the prohibitions of section 9:  first, through permits under subsection 10(a), and second, through exemptions under subsection 10(b).  It then cabined both of these authorities through subsections 10(c) and 10(d).  Subsection 10(c) specifically contemplates individual applications.  *See id.* § 1539(c) ("each application").  Nowhere in section 10 does Congress appear to contemplate exceptions through broad regulations.  In fact, paragraph 10(a)(1)(A) excepts "any act," in the singular, and not any category of activities.  *See id.* § 1539(a)(1)(A).

The FWS argues that it complied with subsection 10(c) by providing notice and comment on its regulation.  But it is difficult to see how the FWS could have complied with the plain language of subsection 10(c) without an application for an exemption or permit before it.[7]

---

[7]  The Safari Club argues that even if an application was required, their comments, and those of other captive breeding facilities, on the proposed rule essentially constituted an application.  They do not argue, however, that their comments provided all of the information that would have been required in an application.  *See* 50 C.F.R. § 17.22(a)(1) (listing the requirements of an application for a permit for the enhancement of propagation or survival of an

Instead, the FWS's interpretation, holding that no application was required, taken to its logical conclusion would mean that where the FWS permits an act under paragraph 10(a)(1) through a regulation, it need not comply with subsection 10(c) at all because there is no application before it. No party argues this. Indeed, plaintiffs' natural reading of section 10 is supported by the FWS's own regulations interpreting that section, which contemplate applications for permits for activities that enhance the propagation or survival of endangered species. *See* 50 C.F.R. § 17.22 ("Upon receipt of a complete application, the Director may issue a permit authorizing any activity otherwise prohibited . . . for enhancing the propagation or survival . . . of endangered wildlife. Such permits may authorize a single transaction, a series of transactions, or a number of activities over a specific period of time.").

### 2. *Purpose and Legislative History*

Plaintiffs argue that the purpose of subsection 10(c) further supports reading that subsection to require individual permit applications. They assert that the purpose of subsection 10(c) is to provide meaningful public participation and that reading this section to authorize broad regulations allowing blanket exemptions thwarts this purpose. Plaintiffs cite to *Gerber v. Norton*, 294 F.3d 173, 180 (D.C. Cir. 2002), in which the D.C. Circuit held that the FWS violated subsection 10(c) by not making a map publicly available, thereby not providing the public with the meaningful opportunity to participate that subsection 10(c) requires. Under the Rule, by contrast, plaintiffs assert that they are denied the opportunity to receive or comment on any of the information that will be relied on by a sport hunting ranch to engage in otherwise prohibited acts with respect to the antelope species. Plaintiffs contend that they cannot even find

---

endangered species).

out which entities are operating under the new regulation, let alone receive all of the information that would be contained in a permit application under the FWS's section 10 regulations.  The FWS's interpretation thus eliminates any opportunity to monitor whether hunting ranches actually fulfill the purposes of the ESA and prevents meaningful opportunity for public comment mandated by the Act, according to plaintiffs.  The FWS responds that it provided all the information required to allow the public a meaningful opportunity to comment on the exemption issued in this case through the comment period on the Rule and thus complied with the requirements of subsection 10(c).  The Safari Club adds that the information that the FWS collected as a result of the notice and comment opportunity for the Rule provided plaintiffs with abundant data pertaining to the status of the antelope species.  Plaintiffs have the better argument.

By assertedly complying with subsection 10(c) through publishing a proposed rule, accepting comment on that proposed rule, and providing information received in that process as opposed to through responding to an individual application, the FWS abstracts the question of whether the exception will enhance the propagation or survival of the species from the specific to the general.  In this way, the FWS avoids providing the information that would necessarily accompany an application, such as "a complete description and address of the institution or other facility where the wildlife sought to be covered by the permit will be used, displayed, or maintained," and "[a] full statement of the reasons why the applicant is justified in obtaining a permit including the details of the activities sought to be authorized by the permit."  *See* 50 C.F.R. § 17.22(a).  This hinders the ability of individuals and groups to participate in the meaningful way contemplated by the ESA because, without this information, it is impossible to evaluate whether each permitted act will enhance the propagation or survival of the species.

24

The FWS argues that the Rule ensures that the exception will enhance the propagation or survival of the antelope species by requiring that those taking advantage of the exception maintain the antelope species in a manner that contributes to increasing or sustaining captive numbers or to potential reintroduction to range countries and manage the species in a manner that maintains genetic diversity. *See* 70 Fed. Reg. at 52319. The information necessary to determine whether those taking advantage of the exception are actually doing so, however, need only be maintained and made accessible to the FWS for inspection. *See id*. Thus, plaintiffs are deprived of the information they would otherwise be provided to assess whether individual facilities will or are in fact maintaining the antelope species in a manner that contributes to their propagation or survival and thus are entitled to the exception. Instead, by requiring such information to be available only to the FWS, the public is shut out. This flies in the face of the "meaningful opportunity" that subsection 10(c) was intended to provide. *See Gerber*, 294 F.3d at 179.

Plaintiffs further argue that the legislative history of section 10 reveals a Congressional intent to limit exceptions under section 10 to individual cases. According to plaintiffs, Congress indicated that it included subsection 10(d), which requires certain findings before an exception to the take prohibitions may be made, in order to "limit substantially the number of exemptions that may be granted under the act." *See* H.R. Rep. 93-412, at 17. Plaintiffs also point to the Joint Explanatory Statement of the Committee of Conference with respect to the provisions for threatened species, which states that "[i]n extreme circumstances . . . this 'conservation' might include authority for carefully controlled taking of surplus members of the species." H.R. Rep. No. 93-740, at 3002 (1972) (Conf. Rep.). The FWS responds that plaintiffs fail to explain how issuing a single exemption is inconsistent with Congress' statement that the subsection 10(d)

25

requirements are intended to limit substantially the number of exemptions that may be granted under the Act.  Contrary to plaintiffs' assertions, the FWS contends that the Rule does not allow an unlimited take of the antelope species, but requires entities to maintain or increase the numbers of the species on their properties.

While plaintiffs other arguments are stronger, the court concludes that the FWS's interpretation that it may permit broad exceptions, as opposed to individual permits, does appear to be at odds with this legislative history.  It makes sense that in order to limit substantially the number of exemptions that may be granted, Congress created a process that requires case-by-case review of exceptions, directing the FWS to provide an opportunity for public comment and make certain findings.  Blanket exemptions under regulations are anathema to this intention because they allow the FWS to permit a great number of exemptions at once without providing the detailed information to the public that would be required in an individualized analysis.

The FWS also makes a legislative history argument.  It asserts that subsection 10(c) was originally part of subsection 10(b), which authorizes hardship exemptions that were intended to be granted on an individual basis through applications.  When Congress transferred the language out of subsection 10(b) and into subsection 10(c) in order to apply the substantive notice and comment requirements to the entirety of section 10, Congress inadvertently retained the "each application" language that was tailored to subsection 10(b), according to the FWS.  The FWS points out that in the original version of the Act, subsection 10(c) referred to this "subsection" instead of this "section," a remnant of when its requirements were part of subsection 10(b), demonstrating the sloppiness with which Congress made the transfer.  Accordingly, the FWS argues that Congress never intended the "each application" language to refer to exceptions under

subsection 10(a), but only to import the notice and comment provisions, and cites to the House

Report which accompanied the 1976 bill, which states that Congress changed the word

"subsection" in 10(c) to "section," in order "to clarify that notice of review of permit applications

applies to the entire section 10 . . . ." *See* H.R. Rep. No. 94-823, at 6 (1976) (House Rep.).

Plaintiffs rejoin that this legislative history actually favors their interpretation.  By moving the

"each application" language from subsection 10(b) and making it apply to exceptions under

either subsections 10(a) or 10(b), plaintiffs argue, Congress evinced an intent to have the

application process apply to all of section 10.  Plaintiffs' argument is well-taken.

　　　The court reads the statement that  "the notice of review of permit applications applies to

the entire section 10" to be just that– a Congressional intent that applications be required to

obtain an exception under any part of section 10.  *See id*.  If Congress intended to apply

subsection 10(c) to exceptions under paragraph 10(a)(1)(A) without an application, it could have

done so by stating that the Secretary shall publish notice of (1) each application for an exemption

or permit or (2) any act that she proposes to permit.  Instead of reading sloppiness into

Congress's changes to the statutory language, the court believes it is more appropriate to interpret

Congress's decision to apply the requirements of subsection 10(c) to all of section 10 to evince

an intent that exceptions under any section 10 provision would proceed through notice and

comment on an application.  Because the court concludes that the text, context, purpose and

history of section 10 show a clear Congressional intent that permits must be considered on a

case-by-case basis, the court grants summary judgment to plaintiffs with respect to their claim

that the FWS violated subsection 10(c) when it promulgated the Rule.

### III.  CONCLUSION

For the foregoing reasons, the court concludes that plaintiffs should be granted summary judgment on their claim under subsection 10(c) of the Act and defendants should be granted summary judgment on the remainder of plaintiffs' claims.   An appropriate order accompanies this memorandum opinion.


Henry H. Kennedy, Jr.
United States District Judge